THOMAS P. RODDY vs. THE FLEISCHMAN DISTILLING
SALES CORPORATION.

Norfolk. November 3, 1971. — December 15, 1971.

Present: TAURO, C.J., CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Evidence,* Opinion: expert; Impairment of earning capacity. *Damages,*
Impairment of earning capacity.

In an action for personal injuries sustained by the plaintiff in a motor
vehicle accident, the defendant was entitled to a new trial where
the jury was allowed to consider an answer to a hypothetical
question to a medical expert as to whether the plaintiff's physical
complaints and conditions after the accident were causally related
to the accident where the question contained major premises which
were not supported by the evidence and the answer was a
nonresponsive opinion which might have gone beyond the witness'
qualifications and might have included conjecture on the witness'
part. |625-627|

At the trial of an action in tort where the only issue before the jury
was one of damages, it as improper for the plaintiff's counsel to
ask repeated leading questions which used the words "convulsion"
and "epilepsy" where there was no medical evidence in the case
supporting the use of such terms and the trial judge repeatedly
excluded such language upon defence counsel's objection. |627-628|

At the trial of an action for personal injuries, where there was
evidence that by reason of the injuries the plaintiff became
permanently unable to perform secondary occupations, there was
no error in admitting expert opinion evidence as to damages for loss
of ability to perform the secondary occupations even though it
appeared that after the accident his earnings from his principal
occupation had increased to an amount which exceeded the total he
had earned from all his occupations before the accident. |628-629|

TORT. Writ in the Superior Court dated September 20,
1965.

The action was tried before *Rose, J.*

*Thomas R. Morse, Jr.* (*Philander S. Ratzkoff* with him)
for the defendant.

*Timothy J. McInerney* for the plaintiff.

HENNESSEY, J. This is an action of tort for personal in-
juries incurred on September 24, 1964, when a motor vehicle

operated by an employee of the defendant collided with a motor vehicle operated by the plaintiff. The defendant admitted liability and the case was tried before a jury solely upon the issue of damages. The jury returned a verdict of $125,000. All of the defendant's exceptions argued before us concern various rulings on evidence by the judge.

The plaintiff incurred a penetrating wound of the right knee which required corrective surgery, head injuries which included laceration of the scalp, a cerebral concussion, and contusion of the right upper arm, and various lesser injuries to other parts of the body. Following the accident, the plaintiff was absent from his principal employment for seven and one-half weeks. He worked thereafter for about five months on a part time basis with a cast on his leg, before returning to his full time duties in his principal employment.

Six medical specialists called by the plaintiff testified that because of the accident of September 24, 1964, he presently suffers from permanent partial disability and permanent symptons related to his right knee, brain, back, neck and eyes, and a permanent post-traumatic anxiety neurosis.

1. The defendant argues several exceptions to the judge's rulings upon evidence during the testimony of Dr. Cammisa, an ophthalmologist, called to the stand by the plaintiff.

Dr. Cammisa testified that he had examined the plaintiff in 1968 and received from the plaintiff a history concerning the automobile accident of September 24, 1964. The plaintiff complained to the doctor of blurry vision, soreness of the eyes, and deep-seated headaches. The doctor's examination disclosed that the plaintiff had defective vision in both eyes, correctable by glasses, and that his eye muscles were not in functional balance.

Dr. Cammisa was then asked a lengthy hypothetical question, which assumed that the plaintiff before the automobile accident of September 24, 1964, "never had any blurry vision and soreness of his eyes with deep-seated headaches." The plaintiff testified, later in the trial, that he had suffered a trauma to the head in 1951, that he thereafter

suffered from paroxysmal temporal headaches and blurring of his vision, and in 1952 a surgical procedure was performed upon him consisting of the boring of two holes through his skull. Thus, when the total evidence had been presented, there was an important difference between the hypothesis presented to Dr. Cammisa and the evidence heard by the jury (in testimony which was binding upon the plaintiff) in that the major symptoms of the plaintiff had preëxisted the 1964 automobile accident.

The doctor was then asked for his opinion as to whether the plaintiff's complaints and eye condition were causally related to the accident of September 24, 1964. The judge allowed the question over the objection and exception of the defendant. Defence counsel stated as the grounds, among others, of his objection that some of the assumed facts were not before the court and jury and that the information possessed by the doctor was insufficient as a basis for an opinion. Before the answer was received, however, the judge gave some instructions to the jury. Although the judge did not say to counsel or to the jury that the answer was to be received de bene, his instructions to the jury were substantially those which accompany a de bene ruling, and defence counsel probably should have inferred that such was the nature of the ruling.[1] The defence thereafter filed no motion to strike the doctor's answer, even after the total evidence in the case had been received, and after the plain-

---

[1] There is also logical ground to argue that the judge's ruling was final and not de bene, and that he left for the jury's final determination not only decisions of fact upon conflicting evidence, which is a proper jury function, but also the decision as to whether any evidence appeared in support of the premises in the hypothetical question, which is a matter solely for the judge's ruling. The instructions were as follows: "Now, Mr. Foreman, and ladies and gentlemen of the jury, I shall, in the course of my instructions, discuss with you under what circumstances the opinion evidence of an expert may be introduced. The opinion evidence of an expert based upon a hypothetical question assumes the facts contained in that hypothetical question have either been shown or demonstrated or will be shown or demonstrated before the case is over. So if in the course of this trial, the facts which are contained in this hypothetical question are not demonstrated to you, are not proven to you by a fair preponderance of the evidence, then you will disregard the opinion of the expert that is rendered upon these hypothetical facts which have not been established."

tiff's own testimony had disclosed the erroneous premises which had been included in the hypothetical question. If the above summary fairly stated the entire basis of the defendant's present argument, we might be inclined to hold that the failure to file an appropriate motion to strike foreclosed the defendant now. *Brek's Case*, 335 Mass. 144, 148–149. *Muldoon* v. *West End Chevrolet, Inc.* 338 Mass. 91, 98. However, the defendant argues that the matter was compounded by subsequent evidentiary developments.

The question which sought Dr. Cammisa's opinion as to causal relationship between the accident of September 24, 1964, and the plaintiff's symptoms called for no more than an affirmative or negative answer. However, the doctor gave a lengthy and nonresponsive answer, which the judge allowed to stand over the objection and exception of the defendant.[2] The doctor spoke of "traumatic cause as fundamental" and "scar tissue sometimes in the base of the brain." Thus, in a nonresponsive answer the witness had volunteered evidence of scar tissue in the brain. Because of the manner in which the testimony was received, the defendant had no opportunity to challenge the doctor's qualifications in this area. Also, considering the language of his answer ("sometimes"), it was not entirely clear then whether Dr. Cammisa was doing any more than conjectur-

---

[2] The defence argues that the answer of the witness was not only nonresponsive but was also vague, obscure and incoherent, and not subject to the construction which the judge subsequently put upon it within the hearing of the jury. The answer of the witness was as follows: "In my opinion, in view of the history that I obtained and the examination conducted with reference to it, especially the ocular muscles, my conclusion was that there is traumatic cause as fundamental in production of these defects I have outlined in the examination. In view of the fact that there are no previous visual disturbances — and these findings are usually residual findings as a result of healing; scar tissue sometimes in the base of the brain, especially with the nerves involved, the third ocular motor nerve, cuts off this communication line to the muscular elements in the eye so that there's deficiency of the action of the eye muscles. And this is primarily the nerve concerned, the third ocular motor nerve, which four of the eye muscles are controlled by this nerve. Especially the one, the elevation of the eye, the inferior oblique muscle being involved shows weakness of elevation." Thereafter, in denying the defence motion to strike the answer as nonresponsive, the judge stated: "I thought he said that the facts upon which he recited to him, in his opinion caused the defects that he had outlined earlier, particularly so in the absence of any previous history of ocular disturbance."

ing as to the presence of scar tissue. Further questioning, over objections and exceptions of the defendant, brought forth the doctor's opinions that "it would be very difficult" to remove "any scarification," and that scar tissue is a "permanent situation." Still later, the doctor testified that the prognosis concerning the man's eyesight "is not a very good one" because "nerve structure is more difficult to produce any kind of restoration or function than any other tissue." The defendant's motion to strike this answer was denied and an exception was saved.

In summary, the jury were ultimately allowed to consider an answer by Dr. Cammisa to a hypothetical question which contained major premises which were not supported by the evidence in the case; in a nonresponsive opinion, which may have been beyond his qualifications and which may have been no more than conjecture on his part, the doctor testified as to scar tissue in the plaintiff's brain; later the doctor gave a pessimistic prognosis as to the plaintiff's eyesight. Since all of this evidence was in the case over the defendant's objections and exceptions, the defendant is entitled to a new trial.

The defendant has argued that the prejudicial effect of this testimony was compounded by the plaintiff's counsel including, in four successive leading questions addressed by him to another medical witness called by the plaintiff, the words "convulsions" and "anti-convulsant" and, upon one occasion, the word "epilepsy." The judge, in response to defence objections, excluded all questions which used the words "convulsions" and "anti-convulsant," and gave special instructions to the jury to ignore the reference to epilepsy. Defence counsel excepted to the denial of his motion for a mistrial after the use of the word "epilepsy." He argues now that, since no medical reports or testimony supported the use of the terms "convulsions," "anti-convulsant," and "epilepsy," the repeated use of the terms was a wilful attempt by the plaintiff's counsel to distort the evidence. Clearly there was impropriety upon the part of the plaintiff's counsel in the repeated use of the terms, but

we do not now reach discussion of the argument that the defendant was entitled to a mistrial, in view of our conclusion above that the defendant is to have a new trial.

2. Because the issue is likely to arise at the retrial of this case, we turn now to a discussion of the defendant's exception to the allowance of a hypothetical question to an actuarial expert called by the plaintiff.

Medical experts had testified that the plaintiff as a result of the accident of September 24, 1964, had incurred permanent injuries to his head, neck, right leg, and back. The plaintiff testified that after the accident he never returned to his two former secondary jobs as a part time waiter, from which he had realized $56 a week. He testified that he was unable to perform those secondary jobs by reason of the symptoms in his head, neck and shoulder and right leg, and the "different seizures" he was getting. However, it was shown that his earnings from his principal occupation had increased after the accident to an amount which exceeded the total that he had formerly earned from his principal employment and his two secondary occupations.

An actuarial expert was allowed, over the defendant's objection and exception, to answer a hypothetical question which asked him to calculate the present value of a sum of money which, if invested at three per cent, would yield $56 a week for the working life expectancy of 35.1 years, and at the end of that time would be exhausted. The witness answered that $64,000 was the sum required.

The defendant argues that the hypothetical question should have been excluded under the rule of *Nisbet* v. *Medaglia*, 356 Mass. 580, 582–584. We do not agree. In the *Nisbet* case, an actuarial expert testified in answer to a hypothetical question similar to the one posed in the case before us. The plaintiff's secondary occupation in the *Nisbet* case was the delivering of newspapers. There was evidence that the plaintiff performed the secondary occupation for a period of approximately three years after the accident, in which he had suffered a back injury. There was evidence, including medical testimony, that the condi-

tion of the plaintiff's back as of the time the case was tried, was such as to render him permanently unable to perform the newspaper work in the future. This court held that the actuarial opinion should have been excluded because there was no evidence that the inability to perform the secondary occupation was caused by the accident there in suit. In the case before us, there was evidence from which the jury could properly infer that the plaintiff's inability to perform the secondary occupations was caused by the accident of September 24, 1964.[3]

The defendant, citing the *Nisbet* case, also incorrectly argues that damages cannot be awarded for a plaintiff's loss of earning capacity involving a secondary occupation where the evidence shows that the plaintiff's total earnings increased after the accident. The fact that a plaintiff's total earnings have remained the same or increased since the accident may be some evidence that there was no loss of earning capacity, but other evidence, as in the case before us, may warrant an award of damages for physical inability to perform formerly remunerative occupations. *Wiles* v. *New York, Chicago & St. Louis R.R.* 283 F. 2d 328, 332. (3d Cir.). *Bochar* v. *J. B. Martin Motors, Inc.* 374 Pa. 240, 244. *Daugherty* v. *Erie R.R.* 403 Pa. 334. Cf. *Shea* v. *Rettie,* 287 Mass. 454. "Because of his present employment Wiles has not yet suffered economic loss but if he cannot obtain gainful employment elsewhere he is chained to his present job in a kind of economic servitude. . . . The availability to Wiles of the labor market for heavy-duty workers was certainly a factor which the jury was entitled to take into consideration in fixing an amount for damages due to him for loss of future earning power" (the *Wiles* case at 332).

3. There is no necessity to discuss other exceptions of

---

[3] The evidentiary basis for the question was sufficient without reliance upon the testimony of the ophthalmologist, Dr. Cammisa, whose opinions, as shown above, were improperly admitted.

the defendant, since the issues concerned are not likely to arise at the retrial of the case.

*Exceptions sustained.*