389 Mass. 528 (1983)
451 N.E.2d 401
IN THE MATTER OF TIMOTHY J. McINERNEY.
Supreme Judicial Court of Massachusetts, Suffolk.
February 10, 1983.
June 20, 1983.
Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.
Laurence M. Johnson for Timothy J. McInerney.
Daniel Klubock, Bar Counsel.
LIACOS, J.
On September 28, 1970, the Boston Bar Association filed an information in the Supreme Judicial Court for Suffolk County seeking disciplinary action against the respondent, Attorney Timothy J. McInerney. On November 18, 1971, a single justice entered an order suspending Mr. McInerney from the practice of law and specified that Mr. McInerney could not seek the termination of the order of suspension for at least one year. Mr. McInerney did not pursue his right of appeal from the order.
Following the order of suspension, evidence of additional improper conduct by Mr. McInerney came to light. Between *529 1974 and 1977, a series of hearings was held before the single justice concerning these matters and to consider motions by Mr. McInerney to terminate his suspension. On September 25, 1981, the single justice filed a memorandum and findings of fact and ordered that a hearing be held concerning disposition. This hearing was held on March 8, 1982. At that time, a stipulation by the respondent and Bar Counsel was filed with the single justice containing a recommendation that Mr. McInerney be disbarred, effective May 16, 1977. Having received the stipulation and certain additional exhibits, the single justice entered a memorandum and order for judgment disbarring Mr. McInerney, effective May 27, 1982.
Mr. McInerney argues that the single justice abused his discretion and committed an error of law by making the order of disbarment effective May 27, 1982, rather than May 16, 1977.[1] We have the memoranda and findings of fact filed by the single justice as the source of facts relevant to this appeal. We also have before us the stipulation filed by the parties, a transcript of the March 8, 1982, hearing, and various exhibits and documents. We affirm the judgment of the single justice.
1. Standard of Review.
We consider first the standard of review we shall apply to a decision of a single justice in a bar discipline matter in the circumstances of the instant case. We recently said, in a case involving the discipline of a lawyer who had been convicted of serious crimes, that "the full court, in reviewing any disciplinary decision, should inquire whether the judgment is markedly disparate from those ordinarily entered by the various single justices in similar cases." Matter of Alter, ante 153, 156 (1983). That particular standard is of limited *530 usefulness here because the instant case presents circumstances which can be described only as unique.[2]
Mr. McInerney argues that we should review the decision of the single justice to determine whether it is supported by sufficient evidence, constitutes an abuse of discretion, and is free from any error of law. For the purposes of deciding this case, we will apply this standard.[3]
2. Misconduct Through and Including 1977.
Mr. McInerney argues that the single justice's decision constituted an abuse of discretion because disbarment, even if effective May 16, 1977, was an extreme and excessive penalty.[4] The thrust of this argument is that Mr. McInerney never committed an act serious enough to warrant disbarment. He also seeks to mitigate the seriousness of his actions during the period of his suspension by pointing out that before June 3, 1974,[5] this court had not adopted explicit rules concerning the proper conduct of a suspended attorney. There was no error.
*531 The flaw in Mr. McInerney's first point is that it fails to consider the totality of the circumstances. The single justice had before him a persistent and extended pattern of improper and unethical behavior by Mr. McInerney which was undeterred by the imposition of lesser sanctions. The various circumstances which occasioned Mr. McInerney's suspension, and the circumstances which followed his suspension, provided the single justice with more than sufficient evidence to conclude that Mr. McInerney's failure to meet the ethical obligations imposed on an attorney were neither isolated nor unintentional.
Mr. McInerney's suspension in 1971. Mr. McInerney was suspended for his part in the execution of a deed by Flora Hayden, an eighty year old woman who was under a conservatorship, conveying a parcel of land to Mr. McInerney's client, a stepson of Hayden. A judge of the Superior Court set aside the deed, stating that it had been "procured by undue influence exercised on (the grantor therein) by (the grantee) with the knowledge and participation of Mr. McInerney." After a hearing on the matter, the single justice entered the November 18, 1971, order suspending Mr. McInerney.
The single justice found that Flora Hayden had been under conservatorship by reason of mental weakness at all times since September 23, 1962. When Mr. McInerney spoke to her about the preparation of the deed, and when he procured the execution of the deed by her on September 5, 1965, at a nursing home, she did not have sufficient mental capacity to understand the nature, significance, effect, and consequences of the execution and delivery of the deed. She was incapable of transacting such business. At all times material to the case, Mr. McInerney knew the facts of the conservatorship of the grantor and knew of her lack of sufficient mental capacity to understand, execute, and deliver a deed.
The flagrant nature of what the single justice referred to as Mr. McInerney's "gross misconduct" is shown in the findings of the single justice that between the date that Mr. McInerney *532 first spoke to the grantor about preparing the deed and the date that he procured its execution, Mr. Inerney received written notice from the conservator about the grantor's lack of mental capacity. Despite such knowledge, and despite the written notice from the conservator, Mr. McInerney prepared and caused the deed to be executed by the incompetent grantor.
Other improper conduct. At the October 2, 1975, hearing, evidence was presented concerning Mr. McInerney's dealings with Agnes and Ella O'Connor, aged eighty-eight and eighty-six, respectively.[6] In June, 1975, Mr. McInerney assisted the O'Connors in creating several joint bank accounts and joint ownership of certain securities. The single justice found Mr. McInerney's conduct improper in that his acts were akin to practicing law. Since the establishment of these joint accounts could produce results different from the testamentary schemes which the O'Connors provided for in their wills, the single justice found that "[t]hey were entitled to have the advice of a lawyer in good standing on the question of [the] impact of the new joint ownerships...."[7]
Also, in 1973 the full court referred to the single justice certain information about four cases in which this court had occasion to include words of sharp reproof for Mr. McInerney's misconduct. In Gardner v. State Taxi, Inc., 336 Mass. 28, 30 (1957), the court stated that Mr. McInerney had made an "improper" argument to a jury and court "far beyond permissible limits." In McInerney v. Massasoit Greyhound Ass'n, 359 Mass. 339, 348 (1971), we said that Mr. McInerney's "evident wilful noncompliance with clear restrictions well known to him, and his arrangement of a *533 transaction with his client whereby she was also not to comply with them, are actions not becoming a lawyer." We also noted that Mr. McInerney's failure to disclose to the Probate Court his personal interest in the divorce settlement did "not commend itself to us," id. at 351, and that his fee agreement in the divorce matter constituted overreaching on his part. Id. at 354. The fee agreement was the basis for the subsequent action against Massasoit Greyhound Association. In Leone v. Doran, 363 Mass. 1, 19 (1973), we criticized in the strongest terms Mr. McInerney's "overreaching and impermissible trial tactics," and in Roddy v. Fleischman Distilling Sales Corp., 360 Mass. 623, 624-628 (1971), we commented upon the "impropriety" of Mr. McInerney's distortion of the evidence by his use of a series of impermissible questions.
Failure to comply with suspension. During hearings held on July 10 and 11, 1974, October 2, 1975, January 2, 1977, and May 16, 1977, the single justice heard evidence demonstrating that Mr. McInerney had failed to comply with the order of suspension. Based on the evidence presented at the July, 1974, hearings, the single justice found that Mr. McInerney had held himself out as a lawyer in good standing, failed to inform his clients of his suspension, failed to withdraw his appearance in a pending case, solicited a fee improperly, failed to respond to repeated inquiries concerning matters entrusted to him, misrepresented that he was on "a sabbatical from the law," failed to respond promptly to an inquiry from the Boston Bar Association concerning his professional conduct, permitted a client's case to be nonsuited for failure to answer interrogatories, caused other lawyers to enter an appearance to file interrogatories without the clients' consent or knowledge,[8] and transferred cases to other lawyers without the knowledge or consent of his clients.
*534 The later hearings revealed additional evidence of improper behavior.[9] At the October 2, 1975, hearing, Mr. McInerney admitted that he still had sixteen active litigation files in his office, almost four years after he had been suspended. He had his counsel make representation to the single justice, however, that he had only then sent letters to the clients and attorneys of record in those cases informing them of his suspension, and that he was in the process of withdrawing his appearances in all pending cases. Yet, based on evidence presented at the January 2, 1977, hearing, the single justice found that Mr. McInerney had not withdrawn his appearance in a pending case until December 22, 1976. Further, based on evidence presented at the May 16, 1977, hearing, the single justice found that Mr. McInerney had not withdrawn his appearance in another case until after January 19, 1977.
We do not need to review in further detail the persistent failure of Mr. McInerney to accept the consequences of his suspension. Mr. McInerney's claim that the absence of a specific rule governing the conduct of a suspended attorney excused his behavior is not responsive to the circumstances of this case. First, we doubt that even before 1974 a suspended attorney could conclude reasonably that he was entitled, as Mr. McInerney claims, to maintain "his contact" with cases in his office. Second, his failure to notify his clients and to withdraw his appearances extended at least through January 19, 1977, long after the adoption of the bar discipline rules. In this regard, Mr. McInerney intentionally and wilfully violated the terms of his suspension and, further, misled the single justice on these matters. Third, Mr. McInerney engaged in improper behavior beyond filing to notify his clients and withdraw his appearances. He *535 actively misled his clients into believing that he had not been suspended; he neglected matters entrusted to him and allowed his clients to be nonsuited; he failed to respond to the obviously legitimate inquiries of his clients; he solicited other attorneys to enter appearances in cases, without the knowledge or consent of his clients.[10] Fourth, we agree with the single justice that Mr. McInerney's performance in the O'Connor matter, even prior to 1977, was "not consistent with a good faith intent to recognize and comply with the natural consequences of his suspension as a lawyer." Mr. McInerney's conduct cannot be dismissed as stemming from the arguably uncertain scope of his duties as a suspended attorney before 1974.
Thus, considering the circumstances up to 1977, we believe that disbarment would be an appropriate disposition. In any discipline case, the primary factor for our consideration "is the effect upon, and perception of, the public and the bar." Matter of Alter, ante 153, 156 (1983). Matter of Keenan, 314 Mass. 544, 547 (1943). This is not a case where an attorney engaged in an isolated course of improper conduct and has recognized the wrongfulness of his actions. In cases such as this, disciplinary measures are necessary to deter future misconduct on the part of all members of the bar and to preserve public confidence in the bar. See Matter of Alter, supra. This case presented circumstances where disbarment would be appropriate as a prophylactic measure to prevent further misconduct by the offending individual. The record before the single justice clearly established Mr. McInerney's willingness to violate the terms of his suspension order and to mislead the court as to the nature and extent of his activities. It also establishes an abiding disregard for the interests of his clients. Disbarment *536 or discipline as of 1977, in addition to the original order of suspension, would have been neither extreme nor excessive. See Matter of Alter, supra at 156-157; Matter of Osserman, 2 Mass. Att'y Discipline Rep. 172 (1981); Matter of Farrand, 2 Mass. Att'y Discipline Rep. 71 (1981). Cf. Matter of Sondej, 2 Mass. Att'y Discipline Rep. 191 (1981) (minimum four-year suspension); Matter of Sederman, 2 Mass. Att'y Discipline Rep. 184 (1980) (minimum five-year suspension).
3. Misconduct and Improprieties After 1977.
Mr. McInerney's next contention is that the single justice committed an error of law by ordering that Mr. McInerney's disbarment be effective May 27, 1982, rather than on May 16, 1977. He argues that the evidence before the single justice did not warrant the conclusion that he engaged in improper acts after May 16, 1977. We disagree.
First, the single justice took judicial notice of the fact that Mr. McInerney continued to list himself as an attorney in the west suburban Boston telephone directory for 1980-1981 and 1981-1982.[11] Given the extensive evidence concerning Mr. McInerney's conduct in holding himself out as an attorney in good standing prior to 1977, the single justice was warranted in concluding that Mr. McInerney intended to hold himself out as a practicing attorney by listing himself as an attorney in the directory. See Commonwealth v. Imbruglia, 377 Mass. 682, 695-696 (1979).
Mr. McInerney asks us to overlook the single justice's findings on this point by claiming that the single justice did not request any further explanation of the matter. After issuing his findings of fact in 1981, the single justice afforded the parties an opportunity to present evidence on any factual issue not already heard. If an explanation of the matter *537 was relevant, it was for Mr. McInerney to come forward with it. There is no cause to complain now.
Second, the single justice, in his memorandum of May 27, 1982, considered Mr. McInerney's handling of the affairs of Ella O'Connor.[12] The facts regarding the matter are undisputed, and the question before the single justice turned on the conclusion which should be drawn from those facts. Between May, 1974, and November, 1980, Ella O'Connor executed three wills and one codicil. These wills were drafted by an attorney who was recommended to Ella O'Connor by Mr. McInerney. The first will made substantial provisions for several relatives and for Mr. McInerney. The subsequent wills contained provisions which were increasingly favorable to Mr. McInerney. The third will essentially left the bulk of the O'Connor estate to Mr. McInerney, or his children, as a residuary legatee.
The single justice also inquired into certain inter vivos transfers of assets by Ella O'Connor to herself and Mr. McInerney as joint tenants.[13] In 1980, two bank accounts were transferred to joint ownership, and most of the remaining assets were placed in joint ownership in June, 1981, about the time when Ella O'Connor was moved from a nursing home in Norwood, Massachusetts, to one in Portsmouth, New Hampshire. Mr. McInerney arranged to have Ella's bank accounts closed out and transferred to a joint account in a New Hampshire bank.[14] After Ella O'Connor's death in November, 1981, at age ninety-three, Mr. McInerney, as executor, reported to a New Hampshire Probate *538 Court that her estate consisted of personal property in the amount of $19,500, and that property held in joint tenancy in the amount of $372,485.98 passed to him as the surviving joint tenant.[15] Mr. McInerney listed his address as "Chester Rd., RFD 2, Derry, New Hampshire 03038." Bar Counsel stipulated that "Mr. McInerney represents that the joint assets ... were placed in the joint names of Ms. O'Connor and Mr. McInerney in order to facilitate Mr. McInerney in assisting Ms. O'Connor in managing her fiscal affairs."
Mr. McInerney's counsel admitted that the arrangement concerning the joint tenancies was unusual and had the effect of ensuring that any changes in O'Connor's will would not reduce significantly the amount of the estate which would pass to Mr. McInerney. Further, Mr. McInerney's actions after O'Connor's death were inconsistent with the assertion that the joint tenancies were created simply to facilitate the management of O'Connor's affairs. As executor of the estate, he reported that all property held in joint tenancy had passed to him at the time of Ella O'Connor's death and did not pass under her will. These undisputed facts warranted the conclusion that Mr. McInerney's actions were improper. As the single justice stated in his findings after the 1975 hearing, when the facts then known as to Mr. McInerney's dealings with Ella O'Connor and her sister were revealed, "[t]hey were entitled to have the advice of a lawyer in good standing on the question of [the] impact of the new joint ownerships...." We note that there is also a substantial question concerning Mr. McInerney's intentions in listing himself as a resident of New Hampshire. These circumstances, together with the cumulative evidence of Mr. McInerney's flouting of the order of suspension, provided sufficient support for the decision of the single justice to make the disbarment effective May 27, 1982.
*539 4. Delay.
Mr. McInerney's final argument is that the single justice's delay in adjudicating this matter deprived him of due process of law and is an additional circumstance which we may consider. It is possible that the single justice could have acted with greater promptness. Yet a large share of the responsibility for the length of these proceedings falls squarely on Mr. McInerney. Had he complied with the terms of his suspension, these proceedings would have been concluded in a timely fashion. While we have considered the delay which has accompanied these proceedings, we do not find that this factor alone requires us to overturn the decision of the single justice. We note that none of the mitigating circumstances listed in the Alter case are present here. See Matter of Alter, supra at 157.
We need not decide whether the single justice's actions constituted a deprivation of due process. Mr. McInerney never raised this issue before the single justice and therefore has not preserved his right to argue the point here. We note that Mr. McInerney's counsel never suggested, during the hearing on disposition, that constitutional principles would be violated if the single justice did not accept the recommendation of the parties to make the disbarment effective on May 16, 1977.[16]
Judgment affirmed.
NOTES
[1] If the disbarment were made effective May 16, 1977, Mr. McInerney would now be eligible to apply for readmission to the bar. S.J.C. Rule 4:01, § 18, as amended, 381 Mass. 784 (1980).
[2] We do look to the decisions of the single justices sitting on bar discipline matters where they provide us with guidance. Thus, we note that prior decisions of the single justices reveal that various acts of misconduct of the same type which are the subject of these proceedings have been viewed with extreme disfavor. See, e.g., Matter of Sondej, 2 Mass. Att'y Discipline Rep. 191 (1981) (consistent pattern of neglect and dishonesty in dealings had serious adverse implications regarding attorney's fitness to practice law); Matter of Farrand, 2 Mass. Att'y Discipline Rep. 71 (1981) (neglect of a legal matter entrusted to attorney together with other misconduct warranted disbarment); Matter of Barkin, 2 Mass. Att'y Discipline Rep. 9, 10 (1980) (practice of law while under an order of suspension is a serious misstep).
[3] Mr. McInerney does not argue that we should apply a stricter standard of review or that we should review the single justice's decision de novo. He has waived, therefore, those claims. Mass. R.A.P. 16 (a) (4), as amended, 367 Mass. 919 (1975).
[4] This argument is made despite the stipulation that disbarment as of May 16, 1977, would be an appropriate disposition.
[5] On June 3, 1974, this court promulgated S.J.C. Rule 4:01, 365 Mass. 696-714 (1974), which created the present system of bar discipline. Section 17 specifically deals with the duties of a disbarred or suspended attorney. 365 Mass. at 710-711. The rule became effective on September 1, 1974. 365 Mass. at 696.
[6] As will be seen, infra, the single justice during the 1982 proceedings which resulted in the order of disbarment reconsidered the O'Connor matter in light of significant facts which occurred after 1975.
[7] The single justice also found that Mr. McInerney represented himself wrongfully to be a lawyer to staff members at Deaconess Hospital during his visits to Agnes O'Connor in May, 1975. He also noted that Mr. McInerney failed to inform his counsel, Bar Counsel, or the court that Agnes O'Connor had died during the course of the bar discipline hearings.
[8] It also appears that Mr. McInerney did not consult with his clients concerning the content of the answers.
[9] At the May 16, 1977, hearing, evidence similar to that presented at the July, 1974, hearings was introduced. The single justice found that in another case Mr. McInerney had misrepresented his status as a lawyer, permitted a case to be nonsuited, maintained that the case was pending, and arranged to have another attorney enter an appearance without the knowledge and consent of his client.
[10] Mr. McInerney's conduct is similar to that which led to the disbarment of an attorney in Office of Disciplinary Counsel v. Herman, 493 Pa. 267, 271 (1981). The unauthorized practice of law has been found to be adequate grounds for disbarment in other jurisdictions. See Florida Bar v. Harnett, 398 So.2d 1352 (Fla. 1981); Carter v. Bucci, R.I. (1982) (442 A.2d 865 [R.I. 1982]).
[11] We note that the decisions from other jurisdictions hold "that unauthorized practice of law includes the mere holding out by a disbarred attorney that he is practicing or is entitled to practice law." Matter of Peterson, 274 N.W.2d 922, 926 (Minn. 1979). See Farnham v. State Bar of Cal., 17 Cal.3d 605 (1976). Such acts would be a sufficient basis for a judgment of disbarment. See note 10, supra.
[12] The May 27, 1982, memorandum was written after the March 8, 1982, hearing in which the single justice received evidence as well as the stipulation of the parties.
[13] Although Bar Counsel stipulated that he was satisfied that the testamentary dispositions in Mr. McInerney's favor were free from any impropriety, the single justice concluded, and we think correctly, that this stipulation did not extend to consideration of the inter vivos transfers.
[14] The proceeds from the closed accounts amounted to $210,603.45. After depositing the money in the New Hampshire bank, Mr. McInerney withdrew the money and invested it in certain government certificates. See note 15, infra.
[15] The property held in joint tenancy consisted of $210,603.45 in a New Hampshire bank account, shares of common stock valued at $156,711.40, and shares of preferred stocks valued at $5,171.13.
[16] At the March 8, 1982, hearing, Mr. McInerney's counsel stated, "I thought, if I might, I would like to address myself to a question that Your Honor asked just a few moments ago about whether the purpose of our stipulation was in some way to inhibit Your Honor's exercise of judgment in the matter and of course it was not. Our stipulation and recommendation is of course merely that. And we recognize that the ultimate decision is, of course, for the court."